UNITED STATES of America, Appellee,

v.

**Michael R. DAVIS, Appellant.**

UNITED STATES of America, Appellee,

v.

**William W. HARRIS, Appellant.**

Nos. 88–2454, 88–2532.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1989.

Decided Aug. 22, 1989.

Counsel who presented argument on behalf of the appellant Davis, was Larry Pace, Kansas City, Mo.

Counsel who presented argument on behalf of the appellee was Robert E. Larsen, Kansas City, Mo.

Counsel who represented appellant Harris, was Charles W. Gordon, Kansas City, Mo.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.

BOWMAN, Circuit Judge.

Michael R. Davis and William W. Harris appeal their convictions for drug-related offenses. After a jury trial, both appellants were convicted of conspiring to distribute cocaine, Davis was convicted of possession of cocaine with intent to distribute, and Harris was convicted of using a telephone in furtherance of a conspiracy to distribute cocaine. The District Court [1] entered judgment and imposed fines and prison sentences. We affirm.

I.

The Government's evidence at trial showed the existence of a cocaine conspiracy from November 1985 to approximately June 16, 1986 involving, along with other individuals, Davis, Harris, Marlene K. Fue,

1. The Honorable Scott O. Wright, Chief United States District Judge for the Western District of Missouri.

and Rolando Soriano.[2] In November 1985 Davis met with Soriano, a Los Angeles area drug dealer, and they agreed to work together to import cocaine into Kansas City. A scheme was set up in which Soriano supplied cocaine from Colombian drug sources to Davis, Davis distributed the cocaine to individuals in the Kansas City area, Harris served as a "mule," or courier of cash and cocaine, for Davis, and Fue was a "mule" for Davis and Harris.

The first cocaine transaction took place in December 1985. Davis flew to Miami, where he met with Soriano and a drug source named Oswaldo Avilas, and for $32,000 in cash he purchased one kilogram of cocaine. Later that month Davis sent Harris to Miami to negotiate a second deal, this one for ten kilograms of cocaine. Soriano did not want to deliver the cocaine to Harris, so he and his "mule," Marcos Rodriguez, drove the ten kilograms of cocaine to Kansas City and personally delivered the cocaine to Davis. For the ten kilograms of cocaine Davis was to pay Soriano $350,000.

In February 1986 Soriano arranged a deal between Avilas and Davis for five kilograms of cocaine. For this transaction Davis had his brother, Stephen Davis, pick up the cocaine in New York and bring it to Kansas City. Afterward, Stephen Davis drove to Miami to pay $100,000 in cash to Soriano and his sources. Later that month Soriano returned to Kansas City to collect more money from Davis.

Another drug transaction between Soriano and Davis took place in March 1986, this one also involving five kilograms of cocaine. Delivery was made to Davis in Kansas City and, as usual, Soriano "fronted" the cocaine. Early in April 1986 Soriano returned again to Kansas City to collect money for cocaine he had supplied to Davis.

The final cocaine deal occurred in April 1986. This time Davis sent Harris to Los Angeles where Soriano delivered to Harris six kilograms of cocaine. Harris then transported the cocaine by car to Kansas City.

In late May 1986 Soriano again went to Kansas City to try to extract money from Davis. At a meeting involving Soriano, Davis, and Harris, Davis tried to excuse his failure to pay by saying that Harris and others had failed to pay what they owed him. Harris and Davis disagreed sharply over the amount of cocaine money Harris owed, Davis claiming around $100,000 and Harris saying it was more like $6,000. Apparently displeased with Davis's repeated failure to pay, Soriano told Davis to give Harris the cocaine remaining from the latest delivery so that Harris could sell it. Harris unsuccessfully attempted to arrange another cocaine transaction in June 1986.

Fue's role in the conspiracy primarily was to transport cash. During the latter weeks of the conspiracy, Fue made three trips to Miami to deliver money to Soriano and his Colombian sources on behalf of the appellants. Over the course of these trips, the last of which was May 29, 1986, Fue delivered, by her own estimate, over $100,000 in cash.

In the superseding indictment on which the case was tried, Davis, Harris, and Fue were charged in Count I with conspiring with Soriano and others to possess and distribute cocaine, a violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982). Davis was charged in Count II with possession of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). And Fue was charged in Count III and Harris in Counts IV through IX with using a telephone in furtherance of a conspiracy to distribute cocaine, a violation of 21 U.S.C. § 843(b) (1982).[3]

On June 28, 1988 an evidentiary hearing was held before United States Magistrate Calvin K. Hamilton on Davis's motion to suppress statements and cocaine obtained

---

**2.** Soriano was named in the superseding indictment as a coconspirator, but in exchange for serving as a Government witness was not prosecuted for offenses committed in the Western District of Missouri.

**3.** Fue (a/k/a Karemah F. Abdul Jabbar) became a cooperating witness and pleaded guilty to the charge in Count III in exchange for having the conspiracy charge dropped.

by the police after he was stopped February 18, 1986 for a traffic violation. On July 18, 1988 Magistrate Hamilton filed a report in which he recommended that Davis's motion be denied. Magistrate Hamilton's Report and Recommendation, to which Davis filed no objections, was adopted in its entirety by the District Court in a July 29, 1988 order denying Davis's motion.[4]

On July 20, 1988 a hearing was held before Judge Bartlett on motions by Davis and Harris to suppress incriminating wiretap evidence. Both motions were denied.

The case went to trial August 1, 1988, and after a three-day trial the jury found Davis and Harris guilty as charged.[5] Davis and Harris appeal, separately briefing their arguments.

## II.

### A.

Davis first argues that cocaine seized from a car he was driving should not have been admitted into evidence at trial because the search leading to its discovery was unconstitutional.

The cocaine at issue was seized on the night of February 18, 1986, after Kansas City, Missouri police officers Vincent Cannon and Les Ramsey stopped Davis for speeding. When Officer Cannon discovered that Davis's license had been suspended and was to be revoked, Cannon informed Davis he was under arrest for driving without a valid license, and directed him to go to the police car to speak with Officer Ramsey. There was no other person in the car Davis had been driving. Following standard local police procedure, Cannon determined the car would have to be towed and he proceeded to conduct an inventory search of the car. During the search Cannon spotted two paper bags on the passenger-side front floorboard. One bag was partially open and Cannon saw in it ammunition and a stack of twenty-dollar bills. He then opened the other bag and found a white substance he thought was cocaine. Believing at that point that he was dealing with more than a mere traffic offender, Cannon returned to the police car and handcuffed Davis. The white substance Officer Cannon found later proved to be cocaine and, after Davis's motion to suppress was denied, was admitted into evidence at trial.

■ Davis argues that his Fourth Amendment right to be free from unreasonable search and seizure was violated because the police searched the car without "probable cause." The argument is without merit. The search made by Officer Cannon was a routine inventory search incident to impoundment of a vehicle. This kind of search does not require a showing of probable cause. The probable-cause requirement is " 'peculiarly related to criminal investigations, not routine, noncriminal procedures.' " *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976)). *See also United States v. Chadwick*, 433 U.S. 1, 10 n. 5, 97 S.Ct. 2476, 2482 n. 5, 53 L.Ed.2d 538 (1977). The constitutional reasonableness of the search in this case must be determined on some basis other than probable cause.

■ To determine whether the search here was reasonable, we look first to the interests it served. The Supreme Court has emphasized that inventory searches further a number of significant governmental interests. In *Bertine* the Court reviewed *Opperman* and *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), in which it found inventory searches reasonable, and noted:

[T]he governmental interests justifying the inventory searches in *Opperman* and *Lafayette* are nearly the same as those which obtain here. In each case, the police were potentially responsible for the property taken into their custody.

---

4. The July 29 order was issued by the Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

5. Count IX, which pertained only to Harris, was dropped before trial.

By securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property.

*Bertine*, 479 U.S. at 372–73, 107 S.Ct. at 741–42. The interests cited by the Court in *Bertine* were precisely served by the search in this case. The car was both a likely target for vandals and a potential source for subsequent dangerous and illegal activity. The car had been stopped in a high crime area, and as it turned out, lying on the front floorboard was a sack with a large stack of $20 bills and .25 caliber ammunition, and next to that was a bag containing more than 100 grams of cocaine.[6]

An inventory search is not constitutionally reasonable, however, merely because it serves important governmental interests. To pass constitutional muster, the search also must be conducted pursuant to standard police procedures. *See Bertine*, 479 U.S. at 376, 107 S.Ct. at 744 (Blackmun, J., concurring). The trial court found that Officer Cannon conducted his search of the car and its contents in accordance with standard local police procedures.[7] Davis does not challenge this finding except to argue that because the police could have chosen alternatives to impounding the car,[8] the procedures taken were not "standard." In other words, the search was unconstitutional, according to Davis, because police department regulations gave the officers discretion to choose between impoundment and other methods of safekeeping the property. The Supreme Court, however, has rejected this argument, stating that police discretion of this sort is not prohibited "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 375, 107 S.Ct. at 743. There is no suggestion that the police in this case did not exercise discretion according to standard criteria or that they were prompted by an investigatory motive.

Davis further contends that because available alternatives were less intrusive, the police were obliged to offer to use them. Like the preceding argument, this argument too was rejected in *Bertine*. The Court there said that "while giving [the arrestee] an opportunity to make alternate arrangements would undoubtedly have been possible, ... '[t]he real question is not what "could have been achieved," but whether the Fourth Amendment *requires* such steps....'" 479 U.S. at 374, 107 S.Ct. at 742 (quoting *Lafayette*, 462 U.S. at 647, 103 S.Ct. at 2610) (emphasis in *Lafayette*). The Court concluded that when "reasonable police regulations relating to inventory procedures [are] administered in good faith" and "according to standardized criteria," the Fourth Amendment is satisfied. *Bertine*, 479 U.S. at 374 & n. 6, 107 S.Ct. at 742 & n. 6. We are presented with no persuasive reason for finding the inventory search in this case unconstitutional.[9]

### B.

Davis next makes a number of joinder and severance arguments. The issues

---

**6.** There is no indication that Officer Cannon's inventory was "slipshod" so that it would not have protected the police against claims by Davis that his property had been lost or stolen. *See Bertine*, 479 U.S. at 383, 107 S.Ct. at 747 (Marshall, J., dissenting).

**7.** *See* Report and Recommendation at 5, 7–8, 12, which, as we previously noted, the District Court accepted in its entirety. *See supra* p. 1338 & n. 4. We note that the Supreme Court has said that if standard police procedures so mandate, the scope of an inventory search of an impounded vehicle and its contents may extend to the opening of closed containers. *See Bertine*, 479 U.S. at 374 n. 6, 107 S.Ct. at 742 n. 6.

**8.** Davis asserts, for example, that he could have been offered the opportunity to make other arrangements for the safekeeping of his property or could have waived his right to seek redress for loss or damage to the car and its contents.

**9.** The District Court also found that the search was constitutional as incident to an arrest. *See* Report and Recommendation at 7. Because we find the search constitutional on other grounds, we need not address that issue.

raised by these arguments are governed by Federal Rules of Criminal Procedure 8 and 14.[10]

■ Davis argues that the trial court violated Rules 8(b) and 14 by refusing to sever his trial from that of Harris. Rule 8(b) permits joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This Court's discussions of Rule 8(b) make clear that when an indictment charges the defendants with involvement in a single common conspiracy, joinder of those defendants under Rule 8(b) is proper. *See, e.g., United States v. Mendoza*, 876 F.2d 639, 643 (8th Cir.1989). The superseding indictment in this case charges Davis and Harris with involvement in a single common conspiracy to possess and distribute cocaine. Thus, the initial joinder was proper.

■ Davis further argues that even if joinder was proper under Rule 8(b), the District Court should have granted him a severance under Rule 14. Rule 14 allows the trial court to order severance even though joinder is proper under Rule 8(b) if the defendant or government appears to be prejudiced by the joinder. The decision to sever lies in the trial court's discretion and we will not find the refusal to sever an abuse of discretion absent a showing of "real prejudice." *United States v. Adkins*, 842 F.2d 210, 212 (8th Cir.1988). *See United States v. Garcia*, 785 F.2d 214, 220 (8th Cir.) ("Appellants must show that the deni-

al of severance clearly and actually prejudiced them."), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986).

■ Davis argues that he should have been given a separate trial under Rule 14 because the quantity of evidence against Harris was greater than that against him. Assuming that more incriminating evidence was presented against Harris than Davis, an assumption of doubtful validity, this is not in itself a basis for finding that the trials should have been severed. "Severance is not required merely because the evidence against one defendant is more damaging than the evidence against another. 'Severance becomes necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants.'" *United States v. Faul*, 748 F.2d 1204, 1217 (8th Cir.1984) (quoting *United States v. Jackson*, 549 F.2d 517, 523 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977)), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985). Davis makes no showing and we find no indication that the jurors were unable to properly compartmentalize the evidence. In fact, the danger of a spillover of evidence in this case was minimal. The trial took only three days, it did not involve complex issues, and there were only two defendants and eight counts. In such a case a jury undoubtedly is capable of properly compartmentalizing the evidence. *See United States v. O'Connell*, 841 F.2d 1408, 1432 (8th Cir.), *cert. denied*, — U.S. —,

---

**10.** Rule 8 provides:

 **(a) Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

 **(b) Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or

more counts together or separately and all of the defendants need not be charged in each count.

Rule 14 provides:

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), —— U.S. ——, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989); *United States v. Andrade*, 788 F.2d 521, 530 (8th Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986).

We also reject Davis's claim that he should have been given a separate trial under Rule 14 because he and Harris had conflicting defenses. To succeed under this claim, Davis at least must show that the defenses were irreconcilable. *United States v. Robinson*, 774 F.2d 261, 267 (8th Cir.1985). He makes no such showing. All he offers in support of his claim is the bare assertion that conflicting defenses existed. The mere existence of generally antagonistic defenses does not require severance, and Davis's assertion "standing alone does not affirmatively demonstrate any prejudice requiring reversal." *Faul*, 748 F.2d at 1217. In sum, we perceive here no basis for departing from the general rule that individuals charged in a conspiracy should be tried jointly. *See United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989).

Davis also argues that there was misjoinder of offenses. He contends that Count I should not have been joined with the other counts because there are no allegations in those counts "that they are part of the same series of acts or transactions as the conspiracy ... alleged in Count I." Brief for Davis at 17. This Court has said, however, that for joinder of counts not brought against each defendant to be proper it may be sufficient for the indictment to allege "other facts" that "at least suggest the existence of an overall scheme encompassing all the defendants and all the charged offenses." *United States v. Bledsoe*, 674 F.2d 647, 656–57 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

The superseding indictment in this case alleges facts which suggest that Counts II and IV through VIII arose out of the conspiracy charged in Count I. Davis and Harris are charged in Count I with conspiring "to distribute and to possess with intent to distribute cocaine." Davis is then charged in Count II with possession with intent to distribute cocaine, a substantive offense that is an objective of the conspiracy. In Counts IV through VIII Harris is charged with using a telephone to facilitate a conspiracy to distribute cocaine, likely concomitant offenses to that charged in Count I. Each of the offenses in Counts II and IV through VIII is alleged to have taken place during the existence of the charged conspiracy.

Furthermore, Federal Rules of Criminal Procedure 52(a), the harmless error rule, applies to claims of misjoinder. *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, misjoinder results in prejudice requiring reversal only when it has had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Lane*, 474 U.S. at 449, 106 S.Ct. at 732 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Here, Davis makes no showing that the alleged misjoinder had a "substantial influence" on the verdict. Considering the overwhelming evidence of Davis's guilt and the likelihood that evidence on Count I would have been admissible anyway in a separate trial on Count II, and vice-versa, we conclude that even if the counts were misjoined (and we do not think they were) the error was harmless. *See Lane*, 474 U.S. at 449, 106 S.Ct. at 732.

### III.

### A.

Harris first claims that the trial court erred by refusing to instruct the jury on multiple conspiracies. A trial court does not commit error by refusing to give a multiple conspiracy instruction, however, when the evidence clearly establishes the existence of a single conspiracy. *See Baker*, 855 F.2d at 1357. As explained in a note to this Circuit's Model Criminal Jury Instructions, when "the evidence substantially points to a single conspiracy, or [when] the evidence is not sufficient to permit a fair inference of multiple conspiracies, no instruction on multiple conspiracies

should be given." Model Criminal Jury Instructions for the Eighth Circuit § 8.01, n. 6 (rev. ed. Jan. 1989) (citations omitted). *See Baker*, 855 F.2d at 1356–57; *United States v. Kirk*, 534 F.2d 1262, 1269 (8th Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977). Whether it was proper for the trial court to refuse to instruct the jury on multiple conspiracies thus turns on what was shown by the evidence.

 Harris asserts that "[t]he evidence at trial clearly indicated the existence of two cocaine conspiracies," one between Soriano and Davis beginning in December 1985 and ending "some time between March and May of 1986," and the other between himself and Soriano beginning in "late April or May of 1986" and ending in June 1986. Brief for Harris at 6. We disagree. We find that the evidence showed only one conspiracy.

A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement. *See United States v. Spector*, 793 F.2d 932, 935–36 (8th Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). As indicated in Part I *supra*, the evidence at trial showed one overall agreement among Soriano, Davis, and Harris to import cocaine into Kansas City for distribution. Soriano served as the source of the drug, Davis was Soriano's "contact" in Kansas City, and Harris was Davis's "mule." It is true that eventually, as Davis repeatedly failed to pay Soriano, relations between Soriano and Davis cooled, and Soriano dealt more directly with Harris. But, contrary to what Harris asserts, this hardly means that the scheme that had started in November 1985 ended and a new conspiracy began. At no relevant time was the objective of the scheme as originally agreed to completed, abandoned, renounced, or otherwise terminated; Harris and Soriano simply continued, albeit in closer association, their longstanding efforts to bring cocaine to Kansas City. Harris, in fact, continued to try to pay Soriano for cocaine delivered earlier in the conspiracy. Furthermore, even if Davis eventually quit the conspiracy, his departure did not necessarily signal the beginning of a new conspiracy between Harris and Soriano, for coconspirators may quit a scheme without leaving in their wake a new conspiracy among the remaining coconspirators. *See Garcia*, 785 F.2d at 225. The evidence of changes in the coconspirators' roles in this case, rather than suggesting the existence of a new conspiracy, clearly showed only "the various phases of one basic and overriding plan." *United States v. Wilson*, 497 F.2d 602, 605 (8th Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974).

The evidence overwhelmingly established the existence of a single conspiracy, and thus the District Court did not err in refusing to give an instruction on multiple conspiracies. *See Baker*, 855 F.2d at 1357.[11]

## B.

 Harris next argues that the District Court erred in failing to instruct the jury that an overt act is an essential element of proof under 21 U.S.C. § 846. In the recent case of *United States v. Covos*, 872 F.2d 805 (8th Cir.1989), *petition for cert. filed*, No. 88–7524 (June 19, 1989), this Court acknowledged that decisions in this Circuit have given conflicting signals as to whether section 846 requires proof of an overt act. The Court went on to say that the more persuasive reasoning, as well as the "overwhelming weight of authority in other circuits," is that section 846 does not require proof of an overt act, and it chose to follow those decisions in this Circuit so holding. *Covos*, 872 F.2d at 809–10. *Covos* reflects our view of the law and, accordingly, we reject Harris's argument. *See* Model Criminal Jury Instructions for the Eighth Circuit, § 8.01 n. 3 (rev. ed. Jan. 1989) (under 21 U.S.C. § 846 "there is no requirement of an overt act").

11. Our holding forecloses Harris's argument that, because the Government failed to prove a single conspiracy, he should have been acquitted on Counts I and IV through VIII.

### C.

Harris also claims that the trial court erred by admitting irrelevant and highly prejudicial evidence. Specifically, he contends that it was error to admit Soriano's testimony that he had offered Harris a gun and marijuana and Fue's testimony that she and Harris had used cocaine.

The trial court exercises "considerable discretion" in determining the evidence to be admitted, *United States v. Lewis,* 759 F.2d 1316, 1336 (8th Cir.), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985), and that discretion is particularly broad in a conspiracy trial. *Baker,* 855 F.2d at 1358. In admitting the evidence at issue here the trial court acted well within its discretion.

The testimony Harris objects to was neither irrelevant nor unduly prejudicial. Soriano's testimony about his offer to provide Harris with a gun and marijuana was probative evidence of the alleged conspiracy because it showed Soriano attempting to collect money owed from earlier cocaine sales and to keep Harris as a cocaine buyer. As Soriano testified, the marijuana was offered to "lure" Harris to pay for previous deliveries of cocaine and the gun was offered to "keep Harris happy." I Tr. at 115. Similarly, Fue's testimony that she and Harris had used cocaine was evidence that Harris was in possession of cocaine in April 1986 while en route from Los Angeles to Kansas City and thus was probative of the Government's claim that in April 1986 Harris obtained cocaine from Soriano in Los Angeles and transported it back to Kansas City. The testimony concerning the weapon and other drug-related activities was probative evidence and was properly admitted. *See Baker,* 855 F.2d at 1358.

### IV.

Finally, both appellants object to the admission into evidence of recorded conversations obtained through a wiretap placed by federal law enforcement officers in the home of Soriano. The initial authorization for the wiretap became effective in March 1986, and the following May an order for continued interception was issued. Davis claims there was neither probable cause nor sufficient need for the wiretap, as required by 18 U.S.C. § 2518(3) (1982 & Supp. V 1987), and that he was not given notice of the wiretap, as required by 18 U.S.C. § 2518(8)(d) (1982 & Supp. V 1987). Harris claims there was not sufficient need for the wiretap extension. We conclude that these claims are without merit.

After a pretrial suppression hearing, the District Court concluded that the wiretap order was supported by probable cause. This is a finding of fact, which we will not reverse unless clearly erroneous. *United States v. Leisure,* 844 F.2d 1347, 1355 (8th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 324, 102 L.Ed.2d 342, — U.S. ——, 109 S.Ct. 403, 102 L.Ed.2d 392 (1988). After thoroughly reviewing the record, we agree there was probable cause. Davis makes no claim that the affidavits filed in support of the wiretap applications were unreliable or that the information set forth in them is inaccurate or false. His claim seems to be that they did not supply sufficient information. An affidavit provides ample information to establish probable cause if it presents facts and circumstances that, when viewed in their totality, support a "reasonable belief" that by employing the wiretap incriminating evidence against the target of the investigation will be obtained. *See Leisure,* 844 F.2d at 1354; 18 U.S.C. § 2518(3)(a), (b) & (d). Almost eighty pages in the first wiretap application affidavit and approximately seventy pages in the second are devoted to setting forth facts and circumstances indicating that evidence of criminal conduct would be obtained by a wiretap. The affidavits contained ample information.

Similarly, we reject Davis's assertion that there was not sufficient need for the wiretap. This too is an issue of fact subject to the clearly erroneous standard of review. *Garcia,* 785 F.2d at 223. "Judicial officers may authorize interception of wire communications if they find that 'normal investigative procedures have been tried and have failed or reasonably appear to be

unlikely to succeed if tried or to be too dangerous.' " *United States v. Jones*, 801 F.2d 304, 314 (8th Cir.1986) (quoting 18 U.S.C. § 2518(3)(c)). The affidavit filed with the initial wiretap application explains at length why traditional investigative techniques had failed to provide needed information or were too dangerous or unlikely to succeed if tried, citing, for example, the difficulty of placing undercover agents into the conspiracy, the ineffectiveness of physical surveillance, the surreptitious conduct of the coconspirators, the danger posed to confidential informants, and the limited utility of toll records, financial statements, and pen registers. The requirements of section 2518(3)(c) were met here. *See Jones*, 801 F.2d at 314–15; *United States v. Daly*, 535 F.2d 434, 438–39 (8th Cir. 1976).[12]

■ We also reject Davis's claim that the evidence should have been suppressed because he did not receive notice, as required by 18 U.S.C. § 2518(8)(d), that his conversations had been intercepted.[13] Failure to meet the notice requirement of section 2518(8)(d) does not render "unlawful an intercept order that in all other respects satisfies the statutory requirements." *United States v. Donovan*, 429 U.S. 413, 434, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977). *See United States v. Barletta*, 565 F.2d 985, 991 (8th Cir.1977). Congress did not intend postintercept notice "to serve as an independent restraint on resort to the wiretap procedure." *Donovan*, 429 U.S. at 439, 97 S.Ct. at 674. Moreover, in preparing for trial Davis apparently had full access to all of the recorded calls and their transcripts and he has failed to show, or even argue, that in failing to properly notify him the government acted in bad faith or that failure to receive the notice caused him prejudice. *See Donovan*, 429 U.S. at 439 n. 26, 97 S.Ct. at 673 n. 26; *Barletta*, 565 F.2d at 991; *United States v. Rizzo*, 492 F.2d 443, 447 (2d Cir.), *cert. denied*, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974). In short, Davis presents no legitimate basis for excluding the wiretap evidence.

Harris claims that, with regard to the wiretap extension application, "[t]he Government failed to comply with the requirement of 18 U.S.C. § 2518 that normal investigation procedures have been tried and have failed before resort to wiretaps is made." Brief for Harris at 16. Harris's argument here is premised on his assertion that "after the first wire interception was concluded, a new investigation began." *Id.* at 18. He contends that "[t]he first investigation involved the attempt to obtain evidence concerning the source of Soriano's cocaine and heroin," an "upstream investigation," but that later a "new" investigation was initiated, focusing on the distribution by Soriano of drugs to persons "downstream." *Id.* at 17–18.

As did the District Court, we reject Harris's contention that there were two investigations, one "upstream" and the other "downstream." The March application indicated that the purpose of the wiretap was to obtain information against Soriano "and others" who were believed to be *inter alia* "*distributing* and *possessing with intent to distribute* cocaine.*" Application at 3 (emphasis added). Further, the affidavit filed in support of the application states that "the communications to be intercepted will concern the dates, times, places, and method of importing, *distributing, selling,* possessing, concealing, and *delivering* controlled substances," Affidavit at 7 (emphasis added), and that the investigation is intended "to develop the evidence necessary to determine the *full scope of the criminal conspiracy*, the identities of *all the co-conspirators*, and the various methods utilized to import and *distribute* heroin and cocaine." *Id.* at 94 (emphasis added). Obtaining evidence of both "upstream" and

---

12. Special Agent Donovan J. Leighton's trial testimony that before the wiretap began the government already had enough evidence to establish that Soriano had committed "crimes," I Tr. at 18, hardly shows that the government had obtained evidence against Soriano's coconspira-tors or evidence of the extent of Soriano's drug-trafficking operations.

13. Notice was mailed, though apparently never received, thirty-four days after the ninety-day statutory period.

"downstream" drug trafficking was, as affiant Special Agent Donovan J. Leighton testified (*see* Transcript of Pretrial Suppression Hearing at 21, 36), the objective of the investigation from the outset. Moreover, the affidavit filed in support of the May wiretap application stated that although the initial wiretap had provided some information, further interception remained necessary because of the deficiencies of alternative investigative techniques, as explained in the earlier affidavit.

Harris also suggested at oral argument that he was attacking the wiretap extension application under 18 U.S.C. § 2518(1)(c), which requires that a wiretap application contain a "full and complete statement" of the need for the wiretap, and that under *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986), we are to review the sufficiency of the application in this regard *de novo*. It is not clear that this issue was raised in the District Court, and therefore it may not be properly before us. Assuming, however, that it is, we reject it. Even applying a *de novo* standard of review, we have no difficulty in concluding that the application fully satisfied the requirements of section 2518(1)(c).

This is not a close case. The facts here are much like those involved in *Daly*. The illicit operation placed heavy reliance on telephones, the participants communicated through specialized jargon, and there was a marked distrust of confederates and significant danger posed to investigators. As in *Daly*, these and other factors "rendered normal investigative techniques impractical," and presented "a classic instance where electronic eavesdropping was reasonable and necessary." *Daly*, 535 F.2d at 439.

## V.

We have carefully considered the merits of each of the appellants' arguments, except for Davis's claims in his pro se brief that he was denied effective assistance of counsel and received an illegal sentence,[14] and conclude that appellants have not shown any basis for the reversal of their convictions. The judgments of the District Court are AFFIRMED.

---

**14.** These claims are not properly before us. If they are to be made, Davis's claim of ineffective assistance of counsel should be raised in the District Court in a motion made pursuant to 28 U.S.C. § 2255, not in this direct appeal, *see United States v. Gray*, 464 F.2d 632, 634 n. 1 (8th Cir.1972), and his claim that he received an illegal sentence likewise should first be raised in the sentencing court. *See Winston v. Mustain*, 562 F.2d 565, 566 (8th Cir.1977). We point out that Davis's penalty is governed by the pre-November 1, 1987 sentencing law, not by the Sentencing Guidelines.